**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DONALD P. BERRY, SR. & DESIGNS 2-U, INC.,**

      **Plaintiffs,**

-vs-             **Case No. 6:05-cv-1332-Orl-31KRS**

**SASSY, INC.,**

      **Defendant.**

_____

**SASSY, INC.,**

      **Plaintiff,**

-vs-             **Case No. 6:05-cv-1402-Orl-31KRS**

**DONALD P. BERRY, SR.,**

      **Defendant**

_____

# ORDER

This matter comes before the Court on the Plaintiffs' motion for a *Markman* order (Doc. 76) and the Defendant's response (Doc. 87), as well as the Defendant's motion for a *Markman* order (Doc. 77) and the Plaintiffs' response (Doc. 88).

**I. Background**

The parties sell competing versions of a feeder intended to allow children and impaired adults to consume solid food without a danger of choking. In the simplest terms, the competing devices consist of a mesh bag into which food is placed and which is then screwed onto a handle.

Donald P. Berry ("Berry") received U.S. Patent No. 6,524,272 (the "'272 Patent"), covering a "Baby Safe Feeder with Integral Mesh Bag," in February 2003.  In February 2006, Berry received a second patent – U.S. Patent No. 7,001,357 (the "'357 Patent"), covering a "Baby Safe Feeder with Integrally Fitted Food Container".  Designs 2-U, Inc. ("Designs 2-U") is the exclusive licensee of both the '272 Patent and the '357 Patent.  Berry and Designs 2-U filed the instant suit in September 2005 (Doc. 1) and amended their complaint to add an infringement claim relating to the then-newly issued '357 Patent in April 2006 (Doc. 31).

On October 26, 2006, Berry and Designs 2-U filed a motion to dismiss their claim relating to the '272 Patent for lack of jurisdiction, which this Court granted on November 20, 2006.  (Doc. 113).  As such, the portions of the instant motions for *Markman* claim construction regarding various elements of the '272 Patent have become moot.

**II.     Standards**

Determining whether an accused process or device infringes a patent claim is a two-step process.  The first step is claim construction, which involves ascertaining the scope and meaning of the claims at issue, while the second step involves determining whether the claims as construed read on the accused device.  *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chemical Co.*, 204 F.3d 1360, 1363 (Fed. Cir. 2000).  Interpretation and construction of patent law claims is a question of law to be resolved by the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d, 967, 970-71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  "In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance.  These sources ... include both intrinsic evidence (*e.g.*, the patent specification and file history) and extrinsic evidence (*e.g.*, expert testimony)."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language and should be looked to first. *Id.* But the different forms of intrinsic evidence are not weighted equally.

> First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, so long as the special definition of the term is clearly stated in the patent specification or file history.
>
> Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. As we have repeatedly stated, claims must be read in view of the specification, of which they are a part. The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.
>
> Third, the court may also consider the prosecution history of the patent, if in evidence. This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims.
>
> In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence. In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.

*Id.* at 1582-83 (internal citations and quotations omitted).

## III.  Analysis

The '357 Patent contains 20 claims, all of which are at issue in this suit. Claims 1, 5, 9, 13, and 17 are independent claims, and each has three dependent claims. For reference, claim 1 reads as follows:

> 1. A device for feeding a young child or impaired adult without the threat of the person choking, said device comprising:
>
> a handle member in combination with an elongate food-receiving container of mesh material, one end of said container having an aperture in which **ring means** is mounted, said handle member having a circularly configured handle end around which is defined a circularly disposed sealing surface and around the adjacent exterior surface of said handle end securing means are disposed;
>
> a closure ring having securing means around its interior surface, with said securing means of said handle end and of said closure ring able to interfit and be tightened so as to be interlocked together, said closure ring having a central aperture around which is disposed an inner shoulder, said inner shoulder being of a size to closely receive said **ring means** but not permitting the passage therethrough of said **ring means**; and
>
> whereby when said elongate container with food therein has been inserted through said aperture in said closure ring and said closure ring has been tightened upon said handle end, said inner shoulder will cause said **ring means** to tightly engage said circularly disposed sealing surface, said elongate container being placable in the mouth of a person to enable semi-solid food in said container to at least partially dissolve in the mouth of the person.

(Col. 7, lines 14-41) (emphasis added).[1] That claim's dependent claims, which are substantially similar to the dependent claims of every other independent claim, are:

---

[1] In layman's terms, the competing devices resemble a handle with a threaded top, somewhat like the top of a resealable bottle of soda, a ring resembling a soda bottle cap with a hole in it, and an open-ended mesh bag with a ring attached to its opening. The mesh bag (or "elongate food receiving container of mesh material") is inserted partway through the cap (or "closure ring"), which is intended to be screwed onto the handle (or "handle member") after the food is inserted into the bag. Once the cap is screwed to the handle, the mesh bag is locked into place.

    2.   The device for feeding a young child or impaired adult without the threat of the person choking as recited in claim 1 in which said securing means of said closure ring and of said handle end are interfitting threads.

    3.   The device for feeding a young child or impaired adult without the threat of the person choking as recited in claim 1 in which said ring means is made of **rigid material**.

    4.   The device for feeding a young child or impaired adult without the threat of the person choking as recited in claim 1 in which said ring means is made of **semi-rigid material**.

(Col. 7, lines 42-51) (emphasis added).

    **A.**    **Rigidity of Ring Means**

The parties' motions are essentially mirror images of another, all disputing essentially the same issues.[2] The keystone of this dispute is the term "ring means," which appears in each independent claim and impacts the other disputed terms. Sassy contends that "ring means" should be construed to mean "that a rigid or semi-rigid ring is mounted at the open end of the food receiving container". (Doc. 77 at 17).[3] Sassy also argues that a "rigid ring" should be construed to

---

[2] The Court notes that one of these issues has been resolved. Sassy originally sought construction of the term "elongate food receiving container of mesh material," but at the hearing it accepted Berry's construction.

[3] More specifically, Sassy contends that what it describes as "element (ii)" of the '357 Patent claims should be construed in this way. (Doc. 77 at 17). However, Sassy points to a different phrase as "element (ii)" in each independent claim, ranging from the phrase "one end of said container having an aperture in which ring means is mounted" in claim 1 to "ring means serving to hold said aperture of said elongate container in an open position to simplify the placement of food in said container" in claim 17. Sassy acknowledges what it calls "minor differences" in the wording of each phrase it designates as element (ii) in the independent claims, but contends that each phrase defines identical subject matter. (Doc. 77 at 16). It is true that "two claims with different terminology can define the exact same subject matter." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (2006). But Sassy offers no explanation as to why the Court should find that these claims – or, more particularly, the differing phrases Sassy points to as element (ii) within these claims – define identical subject matter. The fact that some of the phrases (such as the one in claim 17) include functions that

mean a ring which is stiff and not flexible, and that a "semi-rigid ring" should be construed to mean a ring which is substantially rigid, and thus substantially stiff and not flexible. (Doc. 77 at 17-18). Berry responds that the "ring means" is simply a ring, of no particular rigidity, except where (as in the dependent claims) that rigidity is specified as either rigid or semi-rigid. (Doc. 88 at 8). Berry also contends that "rigid" should be construed as "able to maintain shape without external force" and "semi-rigid" as "partially able to maintain shape without external force". (Doc. 88 at 8).

Sassy offers two arguments in support of its favored construction of "ring means". First, Sassy argues that Berry's use of the word "means" gives rise to a presumption that Berry set forth a means-plus-function limitation as set forth in 35 U.S.C. § 112, ¶ 6. (Doc. 77 at 18). That paragraph provides that

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. Sassy correctly points out that claims 9, 13, and 17 associate the "ring means" with the function of holding the mesh bag open to make it easier to insert food. The specification recites (at Col. 5, lines 30-33) that one purpose of the ring means 36 "is to hold the aperture 34 of the elongate container in an open position to simplify the placement of food in the container" and (at Col. 5, lines 18-20) that the ring means 36 "may be of rigid or semi-rigid

---

the ring means is to perform, while others (such as the phrase in claim 1) do not, leads to a conclusion that the phrases are not defining identical subject matter.

construction." Sassy therefore declares that the structure corresponding to the "ring means" is *only* a rigid or semi-rigid ring. (Doc. 17 at 18).

However, Sassy has misstated the requirements of the Section 112, paragraph 6 presumption. To invoke this presumption requires not merely the use of the word "means" in a claim element but its use *in association with a function. See*, *e.g.*, *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, (Fed. Cir. 1999). Claim 1 and claim 5 do not associate the "ring means" with a function, and therefore the Section 112, paragraph 6 presumption is not invoked in regard to them. The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives. *Philips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005). Thus the "ring means" in claim 1 and claim 5 need not be able to hold the mesh bag open. As such, even assuming that the specification requires a rigid or semi-rigid ring structure to perform that function,[4] that structure would not be required of the "ring means" in claim 1 or claim 5.

Sassy next argues that Berry expressly limited the scope of the "ring means" to a ring that is at least substantially rigid, by way of the following passage in the Detailed Description:

> The central aperture 17 of the closure ring 16 is of a size to receive the elongate container 14 in which soft, readily dissolvable food has been placed. Around the aperture 17 is disposed the previously mentioned inner shoulder or internal shoulder 20, which is of a diameter to closely receive the ring means 36. However, the aperture 17 of the closure ring 16 is sufficiently smaller than the ring means or ring component 36 as to prevent the ring means passing through the aperture of the closure ring. **In all instances the ring means 36 is sufficiently rigid or sturdy as**

---

[4] As Berry points out, the pertinent portion of the specification says the ring means "*may* be of rigid or semi-rigid construction," not that it *must* fall into one of those two categories. (Doc. 88 at 11).

>  **to prevent it being pulled through the aperture 17 of the closure member 16**, even if the caregiver fails to properly tighten the closure member upon the handle member.

(Col. 5, lines 47-59) (emphasis added).

Sassy contends that this "in all instances" language shows that Berry disavowed any invention in which the ring means was not at least substantially rigid. (Doc. 77 at 19). But such a disavowal requires a statement much more explicit than this one. *See, e.g., SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.* (Fed. Cir. 2001) (finding disavowal where specification defined particular structure for "all embodiments of the present invention contemplated and disclosed herein"). The phrase "in all instances" as used here is insufficiently broad and unequivocal to accomplish the complete disavowal that Sassy advocates, and instead refers to all instances of Berry's *preferred embodiment*.

As for the particular terms "ring means," "rigid," and "semi-rigid", the Court agrees with Berry's contention that "ring means" is nothing more than a ring, and that the remaining terms should simply be given their ordinary meanings. (Doc. 88 at 11-12). However, Berry offers no support for the "ordinary meanings" it proposes for those terms, and the Court finds that Sassy's proposed constructions are closer to the mark. In ordinary experience, "rigid" is taken to mean "stiff" or "not flexible". Similarly, "semi-rigid" is regarded to mean "partly rigid" or "somewhat flexible" (not "substantially rigid," as Sassy would have it).

### B. Size of Closure Ring Aperture and Inner Shoulder

Sassy contends that what it refers to as "element (iii)" in each independent claim should be construed to mean that (a) the rigid or semi-rigid ring must be larger than the closure ring aperture, and (b) the rigid or semi-rigid ring must not be able to be pulled through the closure ring aperture,

even if the closure ring is not properly tightened to the handle member. (Doc. 77 at 22). Berry proposes that this disputed element be construed to mean that the closing ring's aperture must be less than that of the ring means, while its inner shoulder must be large enough for the ring means to rest upon. (Doc. 88 at 17).

Unlike the case with element (ii), the language that Sassy points to in each independent claim as element (iii) is sufficiently similar that it likely defines identical subject matter.[5] But Sassy's proposal nonetheless fails. It relies upon a requirement that *in all cases* the ring means must be of rigid or semi-rigid material, a requirement that the Court has already rejected. Sassy's additional argument that the examiner's statement of reasons for allowance (Doc. 77-16 at 3-4) states the claims in the '357 Patent were allowed because, *inter alia*, they recite a device that includes "a closure ring sized to prevent the ring means from passing through a central aperture formed by a shoulder in the closure ring" is simply not persuasive. And Sassy's remaining argument on this point misconstrues the prosecution history. Contrary to Sassy's contention (Doc. 77 at 24), the Examiner's statement of reasons for rejecting what would have been claims 21-25 of the '357 Patent (Doc. 77-14) does not indicate that an inability of the ring means to pass through the closure ring aperture was a requirement for distinguishing claims 21-25 over prior art.

To the extent that such a construction proves necessary, the Court accepts the Plaintiffs' proposed construction of Sassy's element (iii).

---

[5] For example, claim 1's element (iii) consists of the following language: "said inner shoulder being of a size to closely receive said ring means but not permitting the passage therethrough of said ring means". The element (iii) from claim 13 and 17 reads as follows: "around which aperture is disposed an inner shoulder of a diameter to closely receive said ring means but not permitting said ring means to pass through". (Doc. 77 at 15-17). The element (iii) in claim 5 and claim 7 also differ by only a few words.

### C. Diameter of Ring Means

Finally, Sassy offers an "element (iv)" that, it contends, should be construed to mean that "the rigid or semi-rigid ring ... has a minimum diameter which is sufficiently large to make the ring unable to be swallowed by a child or impaired adult." (Doc. 77 at 24-25). Four of the five independent claims contain the following phrase, or its close equivalent: "said ring means being of a diameter as to make it highly unlikely that said elongate container could be swallowed by a child or impaired adult". But claim 1 simply does not. It would therefore be improper to read Sassy's proposed limitation regarding ring means diameter into claim 1. In addition, Sassy's element (iv) also relies on the previously rejected contention that the ring means in every instance must be made of a rigid or semi-rigid material.

Berry's proposed construction, that the "ring means" of claims 5, 9, 13, and 17 must have a diameter, in its typical and unaltered state, greater than the average airway diameter, is in accord with the claim language at issue. To the extent it proves necessary, the Court adopts this construction.

### IV. Conclusion

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED**, that the Plaintiffs' motion for *Markman* order (Doc. 76) and Sassy, Inc.'s Motion for *Markman* Claim Construction (Doc. 77) are **GRANTED IN PART AND DENIED IN PART** as set forth above.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 29, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE